UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION OF THE UNITED STATES OF AMERICA FOR AUTHORIZATION TO OBTAIN HISTORICAL RECORDS CONTAINING CELL SITE INFORMATION, PEN REGISTER / TRAP AND TRACE DEVICES WITH CELL SITE INFORMATION, AND GPS PING DATA CONCERNING THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (765)568-9049, IMSI 310260464175997; <br><br> AND <br><br> IN THE MATTER OF THE USE OF A CELL SITE SIMULATOR TO LOCATE THE TARGET PHONE DESCRIBED IN ATTACHMENT A. | **FILED UNDER SEAL** <br><br> Case No. 5:24-mj-00020 |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Mark P Gunther II, being first duly sworn, do hereby depose and state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for 30 days of historical records containing cell site information, 30 days of prospective Pen Register / Trap and Trace device data with cell site information, and 30 days of prospective GPS "ping" data for the cellular telephone assigned call number (765)568-9049 and accessed through IMSI number 310260464175997 (hereinafter the "SUBJECT TELEPHONE"), with listed subscriber "JOHN GRAY, 88 Vine Ave, Anderson, IN 46016", and used by JOHN AMDAN GRAY, (hereinafter "GRAY"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. The SUBJECT TELEPHONE is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B-1.

1

2. I am employed as a Special Agent with Federal Bureau of Investigation ("FBI") since May 2017 and I am currently assigned to work drug investigations in the Beckley, West Virginia Resident Agency of the Pittsburgh Division. I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in controlled substances investigations, white-collar crime, cyber-crime, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other topics. Prior to my employment with the FBI, I was employed as a Deputy Sheriff with the Raleigh County, West Virginia Sheriff's Office for over nine years, including approximately three years as a detective. During my employment with the FBI and as a Deputy Sheriff, I have participated in many different types of criminal investigations including, but not limited to kidnapping, bank robbery, other violent crimes, health care fraud, financial institution fraud, as well as matters relating to violent street gangs and criminal drug enterprises. As part of my duties with the FBI, I investigate violations of federal law, including drug trafficking offenses.

3. During my tenure with the FBI, I have participated in numerous drug investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous recorded conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking. Through my training, education, and experience, I have become familiar with (a) the manner by which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. During my career in law enforcement, I have personally conducted and participated in numerous federal drug trafficking, human trafficking, and child exploitation investigations, I have been involved in narcotics and child exploitation-related arrests and the execution of search warrants, and I have

assisted in the supervision of activities of informants. Furthermore, I have participated in the investigation of numerous drug trafficking and human trafficking conspiracies, child exploitation cases, and cases involving the use of court-authorized disclosure of location data relating to cellular telephones.

5. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. Among other duties, I am participating in an investigation relating to the distribution of controlled substances by GRAY, PHILLIP GRAY, other persons known, and others as yet unknown ("SUBJECTS" or "SUBJECT INDIVIDUALS"), in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2, that is, distribution of controlled substances; conspiracy to distribute controlled substances; and aiding and abetting.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. Summaries of recorded conversations are based on draft transcripts of those conversations. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this investigation.

7. Based upon my training and experience, and interviews conducted with defendants, informants, and other witnesses to, or participants in, drug trafficking activity, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute drugs. This includes their use of cellular telephones, calling cards, computers, emails, Blackberry PIN-to-PIN, texts, and use of numerical codes and code words to conduct their transactions. In my experience, drug traffickers often obtain cellular telephones in fictitious names and/or the names of other people in an effort to conceal their drug trafficking activities from law enforcement. I am also familiar with the ways in which drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, but not limited to, the use of couriers to transport currency and

proceeds, the use of their associates and nominees to purchase or to hold title to assets, and the use of offshore accounts.

8. Based on my training and experiences in other investigations, I have reviewed telephone billing records for telephones used by drug traffickers. I know that drug trafficking is often furthered by utilizing multiple cellular phones, multiple insulated contacts, and pre-paid cellular phones, which is also known as compartmentalization. The use of the telephones in this manner is designed to help avoid detection by law enforcement.

9. Based upon my training and experience in wire and electronic intercept investigations, which includes, but is not limited to, participating in multiple drug investigations involving such intercepts under Title III, I know that drug traffickers often attempt to thwart law enforcement efforts by frequently changing and fictitiously registering vehicles, telephones, and utility services in order to conceal their true identity. These steps are designed to avoid detection and possible prosecution.

10. In addition, I have consulted with other experienced law enforcement agents regarding narcotics trafficking activities. As a result, the knowledge that I have obtained during my law enforcement career has been further informed by other law enforcement agents with experience conducting narcotics investigations.

11. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841, that is, distribution of controlled substances; 21 U.S.C. § 846, that is, conspiracy to distribute controlled substances; and Title 18 U.S.C. §, that is, aiding and abetting, have been committed, are being committed, AND/OR will be committed by GRAY, the user of the SUBJECT TELEPHONE. There is also probable cause to believe that the location information described in Attachment B-1 will constitute evidence of these criminal violations and assist in determining the location of GRAY, who has an active federal arrest warrant.

12. This Court has jurisdiction to issue the proposed warrant because it is a "court of competent

jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, this Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

## PURPOSE OF AFFIDAVIT

13. I submit this affidavit in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), for 30 days of historical records containing cell site information, 30 days of prospective Pen Register / Trap and Trace device data with cell site information, and 30 days of prospective GPS "ping" data for a cellular telephone ("SUBJECT TELEPHONE") for which the user is believed to be GRAY. In addition to being described in Attachment A along with the information to be seized described in Attachment B-1, the SUBJECT TELEPHONE and its provider is listed below:

| Cellular Phone Number | Carrier | Address |
|---|---|---|
| (765) 568-9049 | T-Mobile | 4 Sylvan Way, Parsippany, NJ 07054 |

14. Another purpose of applying for this warrant is to determine with precision the location of the SUBJECT TELEPHONE. There is reason to believe the SUBJECT TELEPHONE is currently located somewhere within this district because on February 14, 2024, the same day law enforcement officers attempted to serve JOHN GRAY an arrest warrant, JOHN GRAY called the Fayette County Sheriff's Department from the SUBJECT TELEPHONE to ask why officers were at his house. Officers have also received information from a confidential informant that JOHN GRAY has been seen in Beckley, West Virginia, as recently as February 26, 2024. Pursuant to Rule 41(b)(2), law enforcement may locate the SUBJECT TELEPHONE outside the district provided the device is within the district when the warrant is issued.

15. Based on the facts set forth in this affidavit, there is probable cause to believe that JOHN GRAY has violated 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. JOHN GRAY was indicted for these crimes

by a Grand Jury in the Southern District of West Virginia on February 13, 2024, and is the subject of an arrest warrant issued on that same date. There is also probable cause to believe that JOHN GRAY is aware of these charges, and to believe that the SUBJECT TELEPHONE's location will assist law enforcement in arresting JOHN GRAY, who is a person to be arrested within the meaning of Rule 41(c)(4) of the Federal Rules of Criminal Procedure.

16. Because collecting the information authorized by the cell-site simulator warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device" (PRTT), *see* 18 U.S.C. §§ 3127(3) & (4), this application for a warrant is designed to comply with the Pen Register Statute as well as Rule 41. *See* 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. *See* 18 U.S.C. § 3123(b)(1). Consistent with the requirement for an application for a pen register order, I certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the FBI. *See* 18 U.S.C. §§ 3122(b), 3123(b).

## PROBABLE CAUSE

17. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

18. On March 27, 2023, a controlled purchase of two pounds of methamphetamine and one ounce of crack cocaine was set up from JOSHUA GRAY utilizing a confidential informant (CI). During the controlled buy operation, JOSHUA GRAY was not answering his cell phone and the CI made contact with JOHN GRAY. JOHN GRAY contacted JOSHUA GRAY and obtained approval to sell the methamphetamine to the CI. JOHN GRAY subsequently sold approximately two pounds of suspected methamphetamine and approximately one ounce of suspected crack cocaine to the CI.

19. On May 1, 2023, a controlled purchase of two pounds of methamphetamine and one ounce of methamphetamine was set up and completed from JOHN GRAY utilizing a CI. The telephone number the CI utilized to text message with JOHN GRAY was the telephone number for the SUBJECT TELEPHONE. JOHN GRAY subsequently sold approximately two pounds of suspected methamphetamine and approximately one ounce of suspected crack cocaine to the CI.

20. On February 13, 2024, GRAY was indicted by a Federal Grand Jury in the Southern District of West Virginia for one count of violation of 21 U.S.C. Section 841(a)(1) – distribution of methamphetamine, one count of violation of 21 U.S.C. Section 846 – conspiracy to distribute controlled substances, and one count of violation of 18 U.S.C. Section 2 – aiding and abetting, in relation to his activities described above.

21. On February 14, 2024, Agents went to GRAY's known residence at 88 Vine Lane, Oak Hill, West Virginia and attempted to locate GRAY in order to serve an arrest warrant from the above referenced indictment. Agents were unable to locate GRAY at that time. Later the same day, GRAY called the Fayette County Sheriff's Office and asked why law enforcement was at his house earlier. Fayette County dispatchers took a telephone number for GRAY and Agents and members of the US Marshal's Service attempted to contact GRAY and there was no answer.

22. On February 26, 2024, members of the Beckley/Raleigh County Drug and Violent Crime Unit received information from a CI that GRAY had provided a quantity of controlled substances to another individual near McDonald's located at 2930 Robert C. Byrd Drive, Beckley, West Virginia on that date.

23. On February 26, 2024, GRAY contacted US Marshal's asking if he had an arrest warrant out for him. US Marshal's did not confirm to GRAY that he had an arrest warrant in order to avoid GRAY fleeing to avoid prosecution. The telephone number that GRAY called US Marshal's from was the telephone number for the SUBJECT TELEPHONE.

24. For reasons listed above, I believe the SUBJECT TELEPHONE is being utilized by the GRAY, and that the location of the SUBJECT TELEPHONE will provide evidence of criminal activity, including the location of GRAY in order to serve the outstanding arrest warrant that has been issued for him. Specifically, I believe the location of the SUBJECT TELEPHONE will provide evidence of violations of Title 21, United States Code, Section 841(a)(1), that is, possession with intent to distribute and/or distribution of a controlled substance; Title 21, United States Code, Section 846, that is, conspiracy to distribute or possess with the intent to distribute a controlled substance; and 18 U.S.C. § 2, that is, aiding and abetting. I also believe that the requested historical and prospective location information associated with the SUBJECT TELEPHONE will greatly assist the law enforcement in locating and arresting GRAY for the outstanding federal arrest warrant for him. Specifically, the requested historical records will enable law enforcement to identify patterns of life for GRAY, including identifying residences being used by GRAY and vehicles that GRAY is operating. Additionally, the prospective GPS "pings" (carrier provided Location Based Services), Timing Advance Data (e.g. RTT, TrueCall, NELOs), and prospective Pen Register / Trap and Trace devices with cell site information will assist law enforcement by providing real-time location updates for the SUBJECT TELEPHONE and information regarding what phones are in contact with the SUBJECT TELEPHONE. Both of these components will assist law enforcement in furthering the investigation and identifying the whereabouts of GRAY.

25. If law enforcement is unable to locate the SUBJECT TELEPHONE based simply on the requested historical and prospective information, I believe the authority to utilize a Cell Site Simulator (CSS) will materially increase the chances of locating the SUBJECT TELEPHONE and by extension GRAY. If law enforcement is able to locate the SUBJECT TELEPHONE without the use of a CSS, the device will not be utilized. Put another way, law enforcement will use the least intrusive means necessary to locate the SUBJECT TELEPHONE and will employ a CSS only if other investigative techniques are not successful.

26. Lastly, as soon as GRAY has been arrested, law enforcement will immediately discontinue the use of the requested prospective information and the authority to utilize a CSS on the SUBJECT TELEPHONE.

27. Based on my training and experience, and for all the reasons set forth herein, probable cause exists to believe that the location information described in Attachment B-1 and the investigative technique described in Attachment B-2 will enable FBI to locate and arrest GRAY and is relevant to an ongoing investigation.

## APPLICABLE CELLULAR TECHNOLOGY

28. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

29. I know that mobile phone providers have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the mobile phones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the mobile phone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device

9

does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

30. To facilitate execution of the requested CSS warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the SUBJECT TELEPHONE or receiving signals from nearby cellular devices, including the SUBJECT TELEPHONE. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the SUBJECT TELEPHONE and thereby prompt it to send signals that include the unique identifiers of the device. Law enforcement may monitor the signals broadcast by the SUBJECT TELEPHONE and use that information to determine the Target Mobiles Phone's location, even if it is located inside a house, apartment, or other building.

31. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the SUBJECT TELEPHONE, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the SUBJECT TELEPHONE, and law enforcement will limit collection of information from devices other than the SUBJECT TELEPHONE. To the extent that any information from a cellular device other than the SUBJECT TELEPHONE is collected by the law enforcement device, law enforcement will delete that information and will make no investigative use of it absent further order of the court, other than distinguishing the SUBJECT TELEPHONE from all other cellular devices. The FBI considers further details than those stated immediately above about CSS technology to be law enforcement sensitive; that is, disclosure of those details could be used by adversaries of law enforcement to thwart law enforcement efforts.

32. The execution of this warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

**AUTHORIZATION REQUEST**

33. Based on the foregoing, I believe there is probable cause to believe that the SUBJECT TELEPHONE is being utilized and possessed by GRAY. Because of this, I further believe there is probable cause that the location information described in Attachment B-1 and the investigative technique described in Attachment B-2 will enable the FBI to locate GRAY and is relevant to an ongoing investigation involving the violation of Title 21 U.S.C. 841, 846, and Title 18 U.S.C. Section 2.

34. I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41. The proposed CSS warrant also will function as a pen register order under 18 U.S.C. § 3123.

35. I also request that the Court direct the specified electronic service providers to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B-1 unobtrusively and with a minimum of interference with services, including by initiating signals to determine the location of the SUBJECT TELEPHONE on their respective networks, and at such intervals and times as directed by the government. The government will compensate the electronic service providers for reasonable expenses incurred in furnishing such facilities or assistance.

36. I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order the electronic service providers not to notify any person (including the subscribers or customers to whom the materials relate) of the existence of this application, the warrant, or the execution of the warrant, for the earlier of two years from the date of the Court's Order

or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b). The electronic service providers may disclose this Order to an attorney for the purpose of receiving legal advice. Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the existence of the investigation. There is accordingly reason to believe that notification of the existence of the Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution and intimidate potential witnesses. *See* 18 U.S.C. § 2705(b).

37. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant authorizing the use of a CSS to delay notice until 30 days from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of the SUBJECT TELEPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

38. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONE outside of daytime hours.

39. I further request that the Court order that all papers in support of these applications, including the affidavit and the search warrant, be sealed until further order of the Court, except that the government may produce them in criminal discovery and provide the precise location data search warrant to the electronic service providers. These documents discuss an ongoing criminal investigation that is

neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

40. A search warrant may not be legally necessary to compel the investigative technique described in Attachment B-2. Nevertheless, I submit this warrant application out of an abundance of caution.

Respectfully submitted,

*[signature]*
Mark P. Gunther II
FBI Special Agent

Sworn by the affiant telephonically in accordance with the procedures of Rule 4.1 this __28__ day of February, 2024.

*[signature]*
OMAR J. ABOULHOSN
UNITED STATES MAGISTRATE JUDGE

13

## ATTACHMENT A

Information about the location of the SUBJECT TELEPHONE described below with IMSI number 310260464175997 with listed subscriber "JOHN GRAY, 88 Vine Ave, Anderson, IN 46016"

| Cellular Phone Number | Carrier | Address |
|---|---|---|
| (765) 568-9049 | T-Mobile | 4 Sylvan Way, Parsippany, NJ 07054 |

## ATTACHMENT B-1

Information regarding the locations of the SUBJECT TELEPHONE to be utilized to effect the arrest of GRAY and in furtherance of a criminal investigation, to wit:

<u>Historical records related to the SUBJECT TELEPHONE described in Attachment A for a period of thirty (30) days including:</u>

a. Subscriber information including but not limited to the customer's name, address, date of birth, social security number, other phone numbers on the same account, etc.;

b. Device identification information including but not limited to the IMEI, IMSI, ESN, MEID, Wi-Fi and Bluetooth MAC Addresses, make and model of the cellular device(s), etc.;

c. Billing information including but not limited to bank accounts/credit cards used to make payment and dates/locations where cash payments were received;

d. Complete records of usage for voice, SMS, and data sessions, including but not limited to dates, times, durations, called numbers, calling numbers, cellular towers and sectors utilized for each communication, etc.;

e. RTT records, PCMD records, NELOS records, Timing Advance ("TrueCall") records, and all other records containing timing advance measurements and distance-to-tower measurements for all technologies (CDMA, GSM, UMTS, LTE, etc.); and

f. Internet activity reports, records of Internet Protocol (IP) usage, etc.

<u>Prospective information about the location of the SUBJECT TELEPHONE described in Attachment A for a period of thirty (30) days, during all times of day and night, including:</u>

a. E-911 Phase II data;

b. GPS data;

c. Latitude-longitude data;

d. Other precise location information including engineering data to include but not limited to Timing Advance ("TrueCall") data;

e. Pen Register / Trap and Trace device with prospective cell site information or data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the SUBJECT TELEPHONE during any voice,

15

SMS, and/or data transmission, including but not limited to engineering data which would include, but not be limited to PCMD (Per Call Measurement Data), RTT Reports, Timing Advance ("TrueCall") Data and/or NELOS Reports.

*(This warrant does not authorize the collection of any content of any communications.)*

The electronic service providers must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information about the location of the SUBJECT TELEPHONE unobtrusively and with a minimum of interference with services, including by initiating a signal to determine the location of the SUBJECT TELEPHONE on their respective networks, and at such intervals and times directed by the government. The government shall compensate the electronic service providers for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of information about the location of the SUBJECT TELEPHONE. *See* 18 U.S.C. § 3103a(b)(2).

The electronic service providers shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of two year(s) from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b). *See* 18 U.S.C. § 2705(b). The electronic service providers may disclose this Order to an attorney for the purpose of receiving legal advice.

## ATTACHMENT B-2

Pursuant to an investigation involving the distribution of methamphetamine, conspiracy to commit the same, and aiding and abetting, in violation of Title 21 U.S.C. 841(a)(1), 846, and Title 18 U.S.C. Section 2, this warrant authorizes the officers to whom it is directed to determine the location of the SUBJECT TELEPHONE identified in Attachment A by collecting and examining:

1. Radio signals emitted by the SUBJECT TELEPHONE for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. Radio signals emitted by the SUBJECT TELEPHONE in response to radio signals sent to the cellular devices by the officers, for a period of 30 days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications or any other content, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).

Once the further identification and specific location of the target cellular device has been made, information regarding any other telephones besides the Target Cellular Device will be deleted, and agents will cease using this electronic investigative technique.